United States District Court
For the Northern District of California

1
2
3
4
5
6                    UNITED STATES DISTRICT COURT

7                    NORTHERN DISTRICT OF CALIFORNIA

8
9
10
11
12   CARL T. EDWARDS,

             Plaintiff,                    No. C 07-4573 PJH

13
14        v.                               **ORDER GRANTING DEFENDANT'S
                                           MOTION FOR SUMMARY JUDGMENT
     AT&T DISABILITY INCOME PLAN,          AND DENYING PLAINTIFF'S MOTION
15                                         FOR SUMMARY JUDGMENT**
             Defendant.
16   _____/

17        Before the court are the parties' cross motions for summary judgment.  Having read

18   the parties' papers and carefully considered their arguments and the relevant legal

19   authority, and good cause appearing, the court hereby GRANTS defendant's motion and

20   DENIES plaintiff's motion.

21                              **BACKGROUND**

22        This is an action brought under the Employment Retirement Income Security Act of

23   1974, 29 U.S.C. § 1001, et seq. ("ERISA"), alleging unlawful denial of long-term disability

24   benefits.  Plaintiff Carl T. Edwards is a former employee of the American Telephone and

25   Telegraph Company, and later, of Pacific Bell Telephone Company ("Pacific Bell").  Plaintiff

26   was a participant in the SBC Umbrella Benefit Plan No. 1 (now known as the AT&T

27   Umbrella Benefit Plan No. 1), an employee welfare benefit plan governed by ERISA.  The

28   AT&T Umbrella Benefit Plan No. 1 combines numerous benefit plans – including the AT&T

1  Disability Income Plan – into one welfare benefit plan.[1]

2  A.      The Terms and Administration of the Plan

3          The AT&T Disability Income Plan ("the Plan") provides for short-term disability

4  benefits ("STD Plan benefits") and long-term disability benefits ("LTD Plan benefits") to

5  eligible participants, who are either employees or former employees of one of the

6  participating companies (which include Pacific Bell).  Plaintiff was an employee of Pacific

7  Bell from February 2000 through August 18, 2006.  His last position was Manager of

8  Network Services.

9          Under the Plan, eligibility for LTD benefits requires that an employee's condition

10  meet the definitions set forth in the Plan.  The Plan defines "Long Term Disability" as "the

11  period, immediately following a period of fifty-two (52) weeks for which Short Term

12  Disability benefits are payable under the Plan for a Total Disability.  AT&T Long Term

13  Disability Plan ¶ 2.13.  The Plan defines "Total Disability," in relevant part, as follows:

> "Total Disability" or "Totally Disabled" means, with regard to Long Term
> Disability, that because of Illness or Injury, an Employee is prevented from
> engaging in any employment for which the Employee is qualified or may
> reasonably become qualified based on education, training or experience.  An
> Employee is considered Totally Disabled if he is incapable of performing the
> requirements of a job other than one for which the rate of pay is less than
> 50% of his Basic Wage Rate at the time his Long Term Disability started. . . .

18  Id. ¶ 2.26.

19          The Plan provides that AT&T, Inc. ("AT&T" – formerly SBC) is the Plan

20  Administrator.[2]  Id. ¶ 2.20.  The Plan confers discretionary authority on AT&T, "to

21  administer the Plan in all of its details, exclusive of granting and denying of claims, subject

22  to the applicable requirements of law."  Id. ¶ 5.2.1.  Pacific Bell is not now and never has

23  been the Plan Administrator, and has never had responsibility for administering any of the

24  AT&T Plans, or for determining eligibility for STD or LTD Plan benefits for its employees.

25  _____

26     [1]  Plaintiff named the AT&T Disability Income Plan as the defendant in this action.
Defendant asserts, however, that the proper defendant is the AT&T Umbrella Benefit Plan No.
27  1, as the Disability Income Plan was merged into the Umbrella Plan, effective January 1, 2001.

28     [2]  AT&T, Inc. was formed in 2005, when SBC Communications Inc. purchased former
AT&T Corporation.

United States District Court
For the Northern District of California

1    In addition, the Plan requires the Plan Administrator to appoint one or more Claims

2   Administrators.  Id. ¶ 5.4.  The Plan expressly vests absolute discretion in the Claims

3   Administrator, who "shall have full and exclusive authority and discretion to grant and deny

4   claims under the Plan, including the power to interpret the Plan and determine the eligibility

5   of any individual to participate in and receive benefits under the Plan."  Id. ¶ 5.4.4.  The

6   decisions of the Claims Administrator with regard to eligibility of Plan participants to receive

7   benefits under the Plan, and with regard to interpretation of the provisions of the Plan, are

8   "final and conclusive" and "not subject to further review."  Id.

9    Sedgwick Claims Management Services, Inc., ("Sedgwick") is a third-party

10  administrator.  Effective April 2001, AT&T appointed Sedgwick as the Claims Administrator

11  for the Plan, including for claims brought by employees of Pacific Bell; and Sedgwick has

12  served as the Claims Administrator continuously since that date.

13   The Agreement for Administration of Disability Claims under SBC Disability Plans

14  and Administration of SBC's Job Accommodation Process ("the Agreement"), entered into

15  between SBC (now AT&T) and Sedgwick on April 14, 2003, governs Sedgwick's

16  administration of AT&T's disability plans, including the Plan.

17   Until March 1, 2006, the Sedgwick employees who reviewed and evaluated claims

18  for STD and LTD benefits under the Plan worked in a unit of Sedgwick known as the SBC

19  Medical Absence and Accommodation Resource Team ("SMAART").  Effective March 1,

20  2006, the name of that unit was changed from SMAART to the AT&T Integrated Disability

21  Service Center ("IDSC").  Sedgwick's IDSC Quality Review Unit reviews claimant appeals

22  of disability claims.

23   The Agreement between AT&T and Sedgwick provides that any of the services to be

24  performed by Sedgwick under the Agreement may be performed by Sedgwick or any of its

25  subsidiaries without prior written approval by AT&T.  AT&T has no control over

26  Sedgwick's day-to-day decisions regarding the outcome of claims.  Apart from its

27  obligations under the Agreement, Sedgwick does not have any other affiliations or financial

28  associations with AT&T, Inc., or any of its subsidiary companies.

3

United States District Court

For the Northern District of California

1    Under the Agreement,  Sedgwick's responsibilities include reviewing, processing,

2    investigating, evaluating, deciding, and maintaining STD and LTD claims brought by Pacific

3    Bell employees.  Sedgwick approves or denies claims for STD and LTD benefits under the

4    Plan, and reviews denied disability claims on appeal.  In its capacity as reviewer of

5    appeals, Sedgwick operates as a Plan Fiduciary, as defined by ERISA.

6    Sedgwick provides specified services in connection with administering claims

7    brought under the Plan.  As the Claims Administrator for the Plan, Sedgwick has complete

8    discretion to determine whether a participant is disabled.  The Agreement provides that

9    Sedgwick's employees work exclusively for Sedgwick, and are not employees or agents of

10   AT&T, Inc.

11   Pursuant to the Agreement, AT&T Inc. established a demand deposit account (the

12   "Account") that is used by Sedgwick to pay LTD benefits under the AT&T disability plans,

13   including the Plan.  Since January 1, 2003, the Account has been funded by AT&T Inc.

14   Prior to January 1, 2003, the Account was funded by the SBC Voluntary Employees

15   Beneficiary Association Trust, which was funded by SBC's affiliates, including Pacific Bell.

16   Each affiliate would contribute its share of funds to the Trust based on the amount of

17   benefits paid from the Trust to the affiliate's employees.

18   Sedgwick is not, and has never been, required to advance or pay its own funds to

19   pay STD or LTD Plan benefits, losses or expenses under any of the AT&T Inc. disability

20   plans, including the Plan.  Sedgwick notifies the Plan when a participant's claim for STD or

21   LTD Plan benefits has been approved, and if so, for what period of time.

22   Sedgwick has no role in the Plan's funding, and has never been a source of the

23   funds that are used to pay disability benefits under the Plan.  AT&T pays Sedgwick a flat

24   fee for the provision of its claims services.  Pursuant to the Agreement, the amount of the

25   fee is not linked to the outcome of any claim, or to the general approval or denial rate for

26   benefits claims or the outcome of reviews of appeals.  Neither Sedgwick, nor any of its

27   individual employees, has ever been given any financial incentive for approving or denying

28   a claim for STD or LTD benefits, or for reversing or upholding a denial of benefits on

4

1    appeal.

2         The Agreement does not address or establish a target or goal for Sedgwick's rate of

3    claim approval, rate of claim denial, or how it decides an appeal.  Nor does the Agreement

4    provide for any incentives for Sedgwick or any Sedgwick employee relating to meeting a

5    certain target or goal for the rate of approval, denial, or decision on appeal.

6         Neither AT&T nor Sedgwick has an affiliation with any of the medical professionals

7    who complete the independent physician advisor reports.  AT&T has no role in selecting

8    the medical professionals who complete the independent physician advisor reports, and

9    Sedgwick's role is limited to designating the type of professional whose opinion is  required,

10   based on the nature of the claim and the stated medical condition.

11   B.    Background Facts

12        On August 12, 2005, plaintiff applied for STD Plan benefit payments, based on

13   medical diagnoses of peripheral neuropathy and resultant syncope (fainting or temporary

14   loss of consciousness) due to autonomic dysfunction; diabetic neuropathy; diabetes;

15   hypertension; and heart disease.  His application was approved, and he received STD

16   benefits for 52 weeks.  On April 21, 2006, Sedgwick's IDSC advised plaintiff that his STD

17   benefits would expire on August 17, 2006.  Sedgwick further advised plaintiff that he might

18   be eligible for LTD benefits as of August 18, 2006, and invited him to submit LTD benefits

19   application documentation.

20        On May 8, 2006, Sedgwick LTD Case Manager Nayra Rosenston contacted plaintiff

21   by telephone to explain the LTD benefits claim process.  She reviewed, with plaintiff, his

22   permanent work restrictions, and his participation in the internal job search.  Plaintiff

23   confirmed that he could perform "desk-type work" and identified his treating physicians as

24   Drs. Mahmood, Pong, and Chung.  Plaintiff reported that his daily activities included "self-

25   care, cooking, driving grandkids to/from school, [and] dishes . . . " and confirmed that he

26   could drive.

27        Sedgwick confirmed receipt of plaintiff's LTD benefits application on May 15, 2006.

28   In the "Statement of Employee" that plaintiff submitted as part of the application, he

United States District Court

For the Northern District of California

1  answered "Yes" to the question, "If you are unable to return to your job[,] are you able to

2  perform some other job?"  He answered "Deskwork only" to the question "If yes, what type

3  of job?"  Plaintiff also indicated that he had various computer skills and could type 40 words

4  per minute.

5       Sedgwick's LTD unit obtained medical records and other information that plaintiff

6  had submitted in support of his continuing STD benefits, and reviewed that information in

7  connection with the LTD application.  Several of plaintiff's 2006 medical records identified

8  limitations and restrictions that plaintiff's treating neurologist, Dr. Mujahid Mahmood, placed

9  on his return to work.

10      Plaintiff had consulted Dr. Mahmood on November 16, 2005, complaining of multiple

11  episodes of syncope and presyncope.  Dr. Mahmood's examination showed decreased

12  sensory function in the lower extremities in a stocking distribution.  Dr. Mahmood made no

13  comment regarding reflexes, though he observed no obvious weakness.  He suspected

14  that plaintiff had peripheral neuropathy, and ordered an MRI and an MRA of the brain to

15  rule out vertebral basilar insufficiency and obstructive sleep apnea syndrome.

16      Plaintiff saw Dr. Mahmood again on December 7, 2005.  Dr. Mahmood reported that

17  plaintiff could not tolerate the MRI, and that lab studies were unremarkable.  Dr. Mahmood

18  suggested that plaintiff might have autonomic neuropathy due to his diabetes.

19      Plaintiff returned to see Dr. Mahmood on February 3, 2006.  Dr. Mahmood reported

20  that plaintiff's syncope improved with "slowly changing to upright positions," and that

21  plaintiff was being "more vigilant re walking in the dark, watching where he places his feet,

22  etc."  Dr. Mahmood indicated that plaintiff's peripheral neuropathy was "stable" and "most

23  likely secondary to long h/o DM."  Dr. Mahmood also felt that plaintiff's diabetes was "the

24  likely cause of his postural syncope due to resultant autonomic dysfunction."  He

25  recommended aggressive treatment of the diabetes, optimizing hydration, and also

26  recommended that plaintiff change body positions slowly.

27      On February 10, 2006, Dr. Mahmood released plaintiff to return to work: "OK to

28  return to work – but accommodation should be made to ensure Pt. can rise slowly from

United States District Court
For the Northern District of California

1  sitting to standing position.  Also needs to stay well hydrated."  Dr. Mahmood clarified

2  plaintiff's restrictions and limitations on February 14, 2006:  "Caution when changing from

3  sitting to standing.  No repetitive bending, kneeling, climbing ladders/hills.  Limit driving.

4  Desk work/sitting OK."  Dr. Mahmood indicated, among other things, that plaintiff could "[s]it

5  8 hours" and "[s]tand/walk/drive minimal minutes per hour."

6      In a letter dated February 21, 2006, Dr. Mahmood wrote to plaintiff, "You have a

7  history of Peripheral Neuropathy and resultant Syncope due to Autonomic Dysfunction.

8  These conditions significantly limit your ability to change positions quickly, stand or walk for

9  prolonged periods, especially when safety factors/conditions are a consideration.  This

10  limitation is permanent . . . . Any accommodations that can be made in regards to work

11  conditions, disability considerations, etc. would be most beneficial."

12      On July 5, 2006, plaintiff's application for Social Security Disability Insurance

13  ("SSDI") benefits was approved.  The Social Security Administration ("SSA") found that

14  plaintiff "became disabled under our rules on August 12, 2005."

15      On August 8, 2006, Sedgwick referred plaintiff's medical records to an Independent

16  Physician Advisor, Barbara Parke, M.D., Board Certified in Physical Medicine and

17  Rehabilitation, for a file review.  Sedgwick requested that she address two questions –

18  "(1) What are the medically supported r/ls (please clarify who [sic] much walking, standing

19  and driving he is able to do) and (2) Duration?"  Dr. Parke reviewed plaintiff's medical

20  records and confirmed that plaintiff was able to perform sedentary work eight hours a day,

21  and also confirmed the medical limitations set by Dr. Mahmood.

22      Also on August 8, 2006, Sedgwick obtained a Transferable Skill Assessment

23  ("Assessment"), based on plaintiff's training, education, and experience.  The Assessment

24  was based on a review of medical chart notes and records provided by the case manager,

25  on plaintiff's reported employment history and educational background, and on his

26  demonstrated skills.

27      The Assessment found that based on plaintiff's work history and education, "he has

28  demonstrated the following: attention to detail, good customer service skills and excellent

communication skills . . . [and] the ability to perform a variety of duties, including multi-tasking and repetitive short cycle work." The Assessment noted that plaintiff "has the skills to control, direct, and plan the activities of others . . . [and] the ability to supervisor [sic] employees and makes [sic] judgments and decisions." In addition, he is "proficient in Excel and Access . . . [and] has the ability to type 40 words per minute."

The Assessment identified five alternative occupations that plaintiff could perform, within his restrictions. Three of those occupations – manager of customer service, office manager, and supervisor of clerical, generic, satisfied the Basic Wage Rate percentage calculation under § 2.26 of the Plan.

By letter dated August 24, 2006, Sedgwick denied plaintiff's LTD benefits claim, effective August 18, 2006. In the letter, Sedgwick stated that the denial was based on a review of the medical documentation provided by Dr. Mahmood, plaintiff's treating neurologist. Sedgwick advised plaintiff that the medical information provided by Dr. Mahmood was "also reviewed by a Physician Advisor, who rendered an opinion that the clinical evidence supported restrictions from driving and your ability to perform sedentary work."

Sedgwick noted further that "[a] transferable skills analysis completed by a certified rehabilitation consultant identified alternative occupations you are vocationally qualified to perform within your medical restrictions. . . . The occupations are sedentary in nature. The median wages for those occupations, specific to your labor market, provide median wages commensurate to 50% of your basic wage rate at the time Long Term Disability benefits would commence."

Sedgwick added, "If you disagree with our determination, you or your authorized representative may . . . submit[ ] a written appeal within 180 days after you receive this denial notice" and "may also submit additional medical or vocational information, and any facts, data, questions or comments you deem appropriate for us to give your appeal proper consideration."

On November 2, 2006, Sedgwick received a letter dated October 25, 2006, from

United States District Court
For the Northern District of California

1   plaintiff's counsel Daniel Gruber, stating plaintiff's intent to appeal the denial of LTD

2   benefits, and requesting "a complete copy of the claim file/administrative record," as well as

3   copies of the policy at issue, the Summary Plan Description governing plaintiff's claim for

4   benefits, and any claim manuals or guidelines used in the handling of plaintiff's claim.  Mr.

5   Gruber added, "After we have received a copy of the Administrative Record, we will forward

6   all additional information and documentation we believe should be considered as part of the

7   appeal of the denial of Mr. Edwards' claim."

8       Sedgwick acknowledged receipt of the appeal by letter dated November 30, 2006,

9   through its AT&T Integrated Disability Service Center's Quality Review Unit ("QRU").  The

10  letter advised plaintiff that the request for the appeal would be reviewed by the QRU, and

11  that he would receive a written response by January 28, 2007.  The letter added that

12  "[m]edical records including chart notes, diagnostic tests, and hospital summaries, relevant

13  to this absence, should be submitted regardless of the length of the disability."

14      On December 22, 2006, the QRU provided plaintiff's counsel Mr. Gruber with copies

15  of the LTD and STD claim files, and advised how to obtain copies of Plan documents.

16      On February 27, 2007, the QRU received copies of plaintiff's medical records, along

17  with a cover letter from his counsel Mr. Gruber.  Plaintiff submitted medical records from

18  various hospitals and physicians covering the period January 1975 through June 30, 2006.

19  The majority of those records pertained to his history of cardiovascular disease and

20  treatment.  Plaintiff did not provide any updated medical records for the period July 1, 2006,

21  through February 27, 2007, and did not provide any updated information concerning his

22  condition, his work limitations, or his existing limitations.

23      In the accompanying cover letter, Mr. Gruber stated that plaintiff was not eligible for

24  any of the positions identified in the transferable skills analysis:  "He applied for positions

25  that appeared to fall within the realm of his physical abilities and basic wage rate.  He was

26  denied interviews for all of them because he was informed that his restrictions would not

27  allow him to perform the responsibilities of those particular jobs. . . .[T]here are no positions

28  that meet the policy criteria and which Mr. Edwards can safely perform."

1    The QRU followed up with a telephone call, and a letter to plaintiff's counsel dated

2  March 8, 2007, again inviting him to submit any additional medical records that might assist

3  in the QRU's review, and again advising that the QRU's decision would be final and not

4  subject to further review.[3]  The QRU did not receive any additional medical records from

5  plaintiff.

6    On March 8, 2007, Sedgwick's QRU forwarded plaintiff's medical records, together

7  with the claim log, for review by four Independent Physician Advisors:  Dr. Leonard Sonne,

8  Board Certified in Pulmonology and Internal Medicine; Dr. Gary P. Greenhood, Board

9  Certified in Internal Medicine; Dr. Joseph J. Jares, Board Certified in Neurology; and Dr.

10  Michael J. Rosenberg, Board Certified in Cardiology, Internal Medicine, and Interventional

11  Cardiology.  In their March 15, 2007 reports, these four physicians reached the same

12  conclusion as plaintiff's treating physicians – that plaintiff could work a sedentary job, eight

13  hours a day, with accommodations.

14    Dr. Sonne, the pulmonary medicine specialist, noted that notwithstanding the prior

15  diagnosis of sleep apnea, plaintiff's February 2006 sleep study findings revealed no

16  objective evidence of apneas or hypopneas – in short, "no evidence of clinically significant

17  sleep apnea."  In addition, while plaintiff had a 45-year history of smoking cigarettes, until

18  1999, Dr. Sonne found "no documentation of wheezing, cough, and shortness of breath

19  from a pulmonary perspective."  From a pulmonary medicine and sleep medicine

20  perspective, he found "no objective documentation of any restriction, limitation, or

21  impairment that would preclude full-time work in any position from 8/18/06 to [March 2007]

22  or at any time in the medical file."

23    Dr. Greenhood, the internist, stated that in view of the fact that plaintiff's file was also

24  _____

25    [3]  The Summary Plan Description provides,

26  If a claim for benefits is denied in whole or in part, the claimant may appeal this
   denial in writing within 60 days after it is received. . . . The [appeal] decision will

27  be furnished to the claimant in writing within 60 days, or, if extended, within 120
   days after receipt of a written request for review, and will include the specific

28  reasons for the decision. . . . This decision is final and not subject to further
   review.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

being reviewed by a cardiologist, a neurologist, and a pulmonary medicine specialist, he would not address plaintiff's asserted coronary artery disease, peripheral and autonomic neuropathies, syncope, or disordered sleep, but would limit his comments to hypertension and diabetes mellitus (without the associated neuropathy or coronary artery disease).  After reviewing the clinical findings reflected in plaintiff's medical records, Dr. Greenhood found no indication of malignant or accelerated hypertension, or retinopathy, nephopathy, or peripheral vascular disease related to hypertension.  With regard to diabetes mellitus, he found no evidence of retinopathy, ketosis, seizures, hyperosmolar changes, or peripheral vascular disease.  He concluded that "[f]rom an internal medicine perspective divorced from cardiac, neurologic, and pulmonary medicine issues, the submitted [medical records] do not support work absence from 8/18/06 to [March 2007]."

Dr. Jares, the neurologist, recounted plaintiff's medical and neurological history, and noted his attending physicians' recent diagnoses.  He observed that both the tilt table test and the electrophysiological testing for recurring syncope had been normal, and that there was no evidence of significant neurological abnormalities such as weakness, reflex loss, gait dysfunction, or ataxia.  Dr. Jares concluded that based on the "symptoms of autonomic insufficiency probably secondary to diabetes mellitus" and "syncopal-like sensations probably reflecting autonomic dysfunction," plaintiff should be restricted from working at heights or around hazardous or dangerous equipment and should avoid rapid changes in body posture, but also noted that this condition "would not preclude [plaintiff] from doing essentially sedentary work."  Dr. Jares found "no evidence of a condition so severe that [plaintiff] would be unable to perform sedentary work with appropriate safety precautions and procedures."

Finally, Dr. Rosenberg, the cardiologist, reviewed plaintiff's medical records and determined that "[f]rom a cardiovascular perspective [plaintiff] has evidence of preserved left ventricular function and no evidence of significant myocardial ischemia or malignant rhythm disturbance."  In Dr. Rosenberg's opinion, plaintiff "would be capable of moderate workload, and certainly light/sedentary work from . . . 8/18/06 to [March 2007].  Dr.

United States District Court

For the Northern District of California

1  Rosenberg noted that plaintiff's syncope was "more a presyncopal/dizziness sensation . . .

2  the symptoms of which were reported to have improved with slow arising."  He found that

3  there was no evidence of a cardiovascular disorder sufficiently severe to prevent plaintiff

4  from working "at a sedentary, light or moderate level," although plaintiff "should avoid

5  working at heights in an unsupported fashion."

6      In a letter dated March 19, 2007, Sedgwick advised plaintiff's counsel Mr. Gruber

7  that based on the review of plaintiff's LTD benefits claim by the QRU, it had determined to

8  uphold the denial of benefits.  Sedgwick summarized the findings of the four Independent

9  Physician Advisors, and noted that while they had referenced some findings, none were

10  documented to be sufficiently severe to prevent plaintiff from performing any employment

11  for which he was qualified or might reasonably become qualified based on his education,

12  training, or experience as of August 18, 2006.  Sedgwick advised further that under the

13  terms of the Plan, the QRU's decision was final.

14      Plaintiff filed the present action on September 4, 2007, asserting a claim under

15  ERISA, 29 U.S.C. § 1132(a)(1)(B), for unpaid benefits.  Each side now seeks summary

16  judgment.

17                              **DISCUSSION**

18  A.    Legal Standards

19      Ordinarily, summary judgment is appropriate if the pleadings and materials

20  demonstrate there is no genuine issue as to any material fact and the moving party is

21  entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  ERISA actions challenging a

22  denial of benefits, however, require a slightly different analysis.

23      It is well-established that a challenge to an ERISA plan's denial of benefits under 29

24  U.S.C. § 1132(a)(1)(B) is reviewed de novo, unless the benefit Plan gives the administrator

25  discretionary authority to determine eligibility for benefits or to construe the terms of the

26  Plan. Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006) (citing

27  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).  When it is shown that

28  the administrator has such discretion, the court will apply an abuse of discretion standard of

**United States District Court**
For the Northern District of California

1   review.  Id.

2   "When the decision to grant or deny benefits is reviewed for abuse of discretion, a

3   motion for summary judgment is merely the conduit to bring the legal question before the

4   district court and the usual tests of summary judgment, such as whether a genuine dispute

5   of material fact exists, do not apply."  Bendixen v. Standard Ins. Co., 185 F.3d 939, 942

6   (9th Cir. 1999).  In addition, however, where the court considers evidence outside of the

7   administrative record to determine the contours of the abuse-of-discretion standard, the

8   traditional rules of summary judgment apply – "e.g., the requirement that evidence be

9   viewed in the light most favorable to the non-moving party."  Nolan v. Heald College, 551

10  F.3d 1148, 1154 (9th Cir. 2009).

11  Here, defendant requests that the court review the denial of benefits under the

12  abuse of discretion standard, find that the denial was reasonable and supported by the

13  administrative record, and grant its motion for summary judgment.  Plaintiff, on the other

14  hand, asserts that the court should review the denial of his claims de novo and find that he

15  is entitled to LTD benefits under the Plan from August 18, 2006, to the present time.  Thus,

16  the court must decide whether the court should review AT&T's denial of plaintiff's disability

17  claims de novo, or under an abuse of discretion standard; and whether AT&T properly

18  denied plaintiff disability benefits.

19  B.      Proper Standard of Review

20  As noted above, a decision whether to apply de novo review or an abuse of

21  discretion standard depends on the wording of the Plan itself.  As the Ninth Circuit has

22  held, "for a Plan to alter the standard of review from the default of de novo to the more

23  lenient abuse of discretion, the Plan must unambiguously provide discretion to the

24  administrator."  Abatie, 458 F.3d at 964.

25  Here, the SBC [now AT&T] Umbrella Benefit Plan No. 1 provides as follows:

26      The Plan Administrator is the named fiduciary of the Plan, and has the power
        and duty to do all things necessary to carry out the terms of the Plan.  The
27      Plan Administrator has the sole and absolute discretion to interpret the
        provisions of the Plan, to make findings of fact, determine the rights and
28      status of participants and others under the Plan, and decide disputes under

United States District Court

For the Northern District of California

1      the Plan.  To the extent permitted by law, such interpretations, findings,
2      determinations, and decisions shall be final and conclusive on all persons for
       all purposes under the Plan.

3    AT&T Umbrella Benefit Plan No. 1 at 12.

4         Under the standards enunciated in Abatie, this language constitutes an

5    unambiguous grant of discretionary authority on AT&T.  See Abatie, 458 F.3d at 963 (The

6    Plan at issue stated that "[t]he responsibility for full and final determinations of eligibility for

7    benefits; interpretation of terms; [and] determinations of claims ... rests exclusively with

8    Plan administrator.").  For as in Abatie, where the Ninth Circuit noted that Plan language

9    "granting the power to interpret Plan terms and to make final benefits determinations

10   confers discretion on the Plan administrator," the Plan here also grants AT&T the

11   discretionary authority to "interpret the provisions of the Plan," and to "make findings of fact,

12   determine the rights and status of participants and others under the Plan, and decide

13   disputes under the Plan."

14        Seeking to avoid this conclusion, plaintiff argues that AT&T has a structural conflict

15   of interest, sufficient to alter the standard of review from abuse of discretion to de novo

16   review.  A "structural conflict of interest" exits where the same entity acts "as both the Plan

17   administrator and the funding source for benefits."  See Abatie, 458 F.3d at 965 ("[A]n

18   insurer that acts as both the plan administrator and the funding source for benefits operates

19   under what may be termed a structural conflict of interest."); see also Nolan, 551 F.3d at

20   1153.

21        Setting aside for a moment the question whether AT&T has a structural conflict of

22   interest, the court notes that it is not true that were the court to find that such a conflict

23   exists, the standard of review would be altered from abuse of discretion to de novo.

24   In deciding whether such conflicts are sufficient to alter the standard of review from abuse

25   of discretion to de novo review, the Abatie court held that abuse of discretion review is

26   required "whenever an ERISA plan grants discretion to the Plan administrator," and that to

27   the extent a conflict of interest exists, the abuse of discretion review is to be informed "by

28   the nature, extent, and effect on the decision-making process of any conflict of interest that

14

United States District Court

For the Northern District of California

1    may appear in the record." Abatie, 458 F.3d at 967.

2         Put another way, "[w]here a plan administrator operates under a conflict of interest –

3    in this case – a structural conflict, a court must weigh the conflict "as a factor in determining

4    whether there is an abuse of discretion." Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct.

5    2343, 2348 (2008), quoted in Nolan, 551 F.3d at 1153.  Consideration of the conflict can

6    "affect judicial review," and a court must consider the conflict whenever it exists, and must

7    temper the abuse-of-discretion standard with skepticism "commensurate" with the conflict.

8    Abatie, 458 F.3d at 959; see Nolan, 551 F.3d at 1154.

9         In other words, abuse of discretion review is mandated once the court deems that

10   discretionary authority is delegated to the Plan administrator.  Rather than weighing – as in

11   pre-Abatie cases – the conflict of interest issue to determine whether abuse of discretion

12   review should be discarded in favor of de novo review, the court is instead required to

13   weigh the conflict of interest "as a factor in abuse of discretion review," requiring a

14   "case-by-case" balancing.  Abatie, 458 F.3d at 968; see also Glenn, 128 S.Ct. at 2351-52.

15        Thus, because the Plan in the present case unambiguously conferred discretion

16   upon AT&T, the appropriate standard of review is abuse of discretion.  To the extent any

17   conflict of interest exists, the court would consider it as one factor to be weighed against

18   others in determining whether AT&T's denial of plaintiff's claim for LTD benefits was

19   reasonable.

20        In this case, however, plaintiff presents no evidence of conflict in the record or

21   beyond to warrant a high level of skepticism in the abuse-of-discretion analysis.  In Glenn,

22   the Supreme Court held the existence of a structural conflict of interest is more important

23   where "circumstances suggest a higher likelihood that it affected the benefits decision." 128

24   S.Ct. at 2351.  Factors relevant to this determination are whether the insurance company

25   administrator "has a history of biased claims administration;" whether the administrator "has

26   taken active steps to reduce potential bias and to promote accuracy, for example, by

27   walling off claims administrators from those interested in firm finances, or by imposing

28   management checks that penalize inaccurate decisionmaking irrespective of whom the

15

United States District Court

For the Northern District of California

1    inaccuracy benefits."  Id.

2         In the present case, while it is true that AT&T is both the funding source and the

3    Plan Administrator, the Plan requires AT&T to appoint a Claims Administrator, and also

4    vests absolute discretion in the Claims Administrator to "grant and deny claims under the

5    Plan" and to "interpret the Plan and determine the eligibility of any individual to participate

6    in and receive benefits under the Plan."

7         The administrative record reflects that Sedgwick, the entity appointed by AT&T to

8    serve as Claims Administrator, is solely responsible for administering claims under the

9    Plan, including approving or denying and reviewing appeals; and that AT&T is solely

10   responsible for paying the approved claims and does not assert any power in claims

11   determination.  Specifically, the service agreement between Sedgwick and AT&T indicates

12   a separation of the Plan Administrator from the Claims Administrator to such an extent that

13   there is no apparent structural conflict of interest.

14        Moreover, additional evidence provided by AT&T – evidence in the declarations of

15   Susan HagEstad and Nancy Watts – shows that AT&T does not exert any control over

16   claims denied by Sedgwick and does not otherwise encourage Sedgwick to deny claims;

17   that Sedgwick is paid a flat fee for its services, unrelated to whether it grants or denies

18   benefit claims; that Sedgwick's rate of approval or denial of benefits does not affect the

19   compensation of the Sedgwick employees who make decisions about claims under the

20   Plan; and that the independent physician advisors are selected by an independent clearing

21   house unaffiliated with AT&T, the Plan, or Sedgwick.

22        Because Sedgwick has no direct economic interest in whether the claims are

23   approved or denied, there is no risk of any conflict of interest in Sedgwick's administration

24   of the claims.  This fact sets this case apart from cases such as Glenn and Nolan, where

25   the same entity both funded and administered the plans at issue.

26        In Glenn, the Supreme Court noted that the Sixth Circuit had found it relevant that

27   the claims administrator had encouraged the plaintiff to argue to the SSA that she could do

28   no work, had received the bulk of the benefits of her success in doing so (the remainder

16

United States District Court

For the Northern District of California

1    going to the lawyers it recommended), and had then ignored the agency's finding in

2    concluding that the plaintiff could in fact do sedentary work.  Glenn, 128 S.Ct. at 2352

3    (citing Glenn v. MetLife, 461 F.3d 660, 666-69 (6th Cir. 2006)).  The Court noted further

4    that it was also relevant that the administrator had emphasized a report that favored a

5    denial of benefits while de-emphasizing other reports suggesting a contrary conclusion, and

6    failed to provide its independent experts with all of the relevant evidence.  Id. (citing Glenn

7    v. MetLife, 461 F.3d at 669-74).

8        The Court emphasized that in examining for a possible conflict of interest, courts

9    should consider whether a given factor suggests "a higher likelihood that it affected the

10   benefits decision," or whether, to the contrary, "the administrator has taken active steps to

11   reduce potential bias and to promote accuracy, for example, by walling off claims

12   administrators from those interested in firm finances," thereby reducing any conflict "to the

13   vanishing point."  Id. at 2351.

14       Here, plaintiff provides no evidence to counter AT&T's showing of the independence

15   of Sedgwick – as Claims Administrator – from AT&T – the Plan Administrator.  Plaintiff's

16   only argument is that a conflict of interest is demonstrated by Sedgwick's failure to consider

17   the SSA's determination that plaintiff is disabled, and failure to advise the independent

18   physician advisors that plaintiff was approved to receive SSDI benefits.[4]

19   ─────────────────

20       [4] Plaintiff also asserts that a conflict of interest is demonstrated by AT&T's failure to
     share the independent physician advisors' reports with plaintiff until the final decision on the

21   appeal had been issued; and by AT&T's alleged misstatement of plaintiff's physical restrictions
     and limitations in its vocational assessment.  Plaintiff does not explain, however, how these

22   facts – if true – establish a conflict of interest.

23       The independent physician's reports were completed at Sedgwick's request as part of
     the appeal process, and their conclusions agreed with those of Dr. Mahmood.  Plaintiff was

24   repeatedly encouraged to supply additional medical evidence supporting his claim and appeal,
     but chose not to do so.  The Plan clearly states that the decision of the Claims Administrator

25   on appeal is final and not subject to further review, and plaintiff was so advised on more than
     one occasion.

26       As for the vocational assessment, the record shows that the job accommodation

27   specialist who performed the assessment considered all the restrictions and limitations
     indicated by Dr. Mahmood – "No driving; able to walk and stand for 5 minutes every hour; able

28   to sit 8 hrs/day.  Able to speak, type [noting the absence of documentation supporting inability
     to type], perform sedentary activities 8 hrs/workday."  Plaintiff takes issue with the conclusion

United States District Court
For the Northern District of California

1    Under the circumstances of this case, these factors do not suggest that the benefits

2 decision was motivated by AT&T's financial interest.  The fact that the Plan required plaintiff

3 to apply for Social Security benefits does not in itself demonstrate a conflict of interest.[5]

4 Courts have routinely recognized that an LTD benefits plan may apply a different – and

5 more restrictive – standard in determining who is "disabled" than does the SSA, and have

6 held that the plan's more restrictive standard is enforceable.  See e.g., Madden v. ITT Long

7 Term Disability Plan for Salaried Employees, 914 F.2d 1279, 1285 (9th Cir. 1990) (plan

8 fiduciary did not abuse discretion in crediting medical evidence in record showing lack of

9 disability despite Social Security award in favor of claimant); Hoskins v. Bayer Corp. and

10 Business Services Long Term Disability Plan, 564 F.Supp. 2d 1097, 1105 (N.D. Cal. 2008)

11 (defendant plan was not bound by determination reached by SSA); Wallace v. Intel Corp.,

12 2005 WL 3369460 at *9 (D. Ariz., Dec. 12, 2005) (plan administrator's failure to consider

13 plaintiff's Social Security award was not "material, probative evidence" that it acted as a

14 conflicted fiduciary in denying her claim); O'Neil v. Fireman's Fund Am. Ret. Plan, 2005 WL

15 1562799 (N.D. Cal., June 22, 2005) at *7 (SSA award does not show that a plan

16 administrator abused its discretion in denying benefits).

17    The situation in Glenn, to which plaintiff attempts to analogize the facts of his case,

18 differed markedly because MetLife was both the insurer and the plan administrator, and

19 was "authorized both to decide whether an employee is eligible for benefits and to pay

20 those benefits."  Glenn v. MetLife, 461 F.3d at 666.  Thus, there was "an apparent conflict

21 of interest."  Id.

22    On top of that, the Sixth Circuit noted, MetLife assisted the claimant in obtaining

23

24 that he was "able to type," but he never supplied any medical documentation to support his
claim that he could not type, pointing only to the limitation (by Dr. Mahmood in February 2006)
25 of "[n]o repetitive bending, kneeling, climbing" and "repetitive hand motions occasionally,"
which plaintiff mischaracterizes as a limitation of "no repetitive hand motion."  Moreover,
26 plaintiff stated in his April 25, 2006, application for LTD benefits that his office skills included
typing 40 words per minute.
27

28    [5]  Indeed, plaintiff applied for SSDI benefits five months before he applied for LTD
benefits.

United States District Court

For the Northern District of California

1   Social Security benefits, "steer[ing] her to a law firm specializing in securing disability

2   benefits" from the SSA, and reaped a financial benefit of its own when that assistance was

3   successful, but failed to give any weight to SSA's determination that plaintiff was totally

4   disabled. Id. at 667-69.  The court found that because of the evidence of conflict of

5   interest, the failure to evaluate the SSA determination was a "significant factor to be

6   considered" in determining whether MetLife's denial of benefits was arbitrary or capricious.

7        For purposes of the present action, however, it is important to note that the evidence

8   shows that Sedgwick, which made the final decision denying plaintiff's claim, acted

9   independently of AT&T.  In addition, plaintiff has pointed to no evidence that she provided

10  AT&T or Sedgwick with any documentation of the SSA's benefits determination.  The mere

11  fact that plaintiff is deemed disabled by the SSA does not mean that plaintiff should also be

12  deemed disabled under the provisions of the Plan.

13       Social Security disability benefits determinations are made in view of the combined

14  effect of all impairments from which an individual may suffer, and the statute defines

15  "disability" as the "inability to engage in any substantial gainful activity by reason of any

16  medically determinable physical or mental impairment which can be expected to result in

17  death or which has lasted or can be expected to last for a continuous period of not less

18  than 12 months."  See 42 U.S.C. § 423(d).

19       This standard differs from the Plan's narrower definition of "Total Disability" – that

20  "because of Illness or Injury, an Employee is prevented from engaging in any employment

21  for which the Employee is qualified or may reasonably become qualified based on

22  education, training, or experience" – which incorporates the definition of "Illness" as "any

23  disabling condition medically substantiated and treated by a Physician that renders an

24  Employee incapacitated from performing the duties of any job assigned by the Participating

25  Company."

26  C.   Analysis

27       Having determined that the applicable standard of review is abuse of discretion, and

28  that there is no evidence in the record of conflict of interest, the court turns to the question

United States District Court

For the Northern District of California

1   whether AT&T properly denied plaintiff's claim for LTD benefits.  Under the abuse of

2   discretion standard, the court can set aside the administrator's discretionary determination

3   only when it is arbitrary and capricious.  Jordan v. Northrop Grumman Corp. Welfare

4   Benefit Plan, 370 F.3d 869, 875 (9th Cir. 2004).  "[A] decision grounded on any reasonable

5   basis is not arbitrary or capricious, and that in order to be subject to reversal, an

6   administrator's factual findings that a claimant is not totally disabled must be clearly

7   erroneous."  Id. (citation and quotation omitted).

8        Pursuant to this standard of review, the issue before the court is not whether AT&T

9   reached the "correct" decision; the issue is whether there is substantial evidence in the

10  record to support AT&T's decision.  See Snow v. Standard Ins. Co., 87 F.3d 327, 331-32

11  (9th Cir. 1996) (decision is supported by "substantial evidence" where there is relevant

12  evidence that reasonable minds might accept as adequate to support conclusion, even if

13  two inconsistent conclusions can be drawn from evidence), overruled on other grounds,

14  Kearny v. Standard Ins. Co., 175 F.3d 1084 (9th Cir. 1999).  Even decisions directly

15  contrary to evidence in the record may not necessarily amount to an abuse of discretion.

16  Taft v. Equitable Life Assur. Soc., 9 F.3d 1469, 1473 (9th Cir. 1993).

17       Rather, an ERISA administrator abuses its discretion only if it renders a decision

18  without explanation, construes provisions of the plan in a way that conflicts with the plain

19  language of the plan, or relies on clearly erroneous findings of fact.  See Bendixen, 185

20  F.3d at 944; see also Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan, 410

21  F.3d 1173, 1178 (9th Cir. 2005) (the district court should uphold the decision of an ERISA

22  plan administrator "if it is based upon a reasonable interpretation of the plan's terms and

23  was made in good faith").

24       Here, there is little evidence to support a finding that the decision to deny plaintiff's

25  claim for LTD benefits was arbitrary or capricious.  As noted above, the decision to deny

26  the claim was made by the Plan's Claims Administrator – Sedgwick.  The record makes

27  clear that Sedgwick followed its policies and procedures, applied the terms of the Plan

28  correctly, and satisfied ERISA's procedural requirements.  Sedgwick provided plaintiff with

United States District Court

For the Northern District of California

1    a written explanation of the reason for the denial of the claim, advised him of his right to

2    appeal, and provided all claim and Plan documents requested, as well as ample

3    opportunity to provide additional medical evidence in support of his claim and appeal.  See

4    Abatie, 458 F.3d at 969.

5         Plaintiff was represented by counsel in the appeal, and Sedgwick tolled the review

6    process numerous times to allow plaintiff's counsel additional time to collect and submit

7    medical records.  Moreover, after receiving the documents submitted in support of the

8    appeal, Sedgwick invited plaintiff's counsel to submit additional records.  Plaintiff and his

9    counsel had sufficient notice of what was necessary to satisfy Plan requirements, and also

10   had ample opportunity to provide the information to Sedgwick.

11        Substantial evidence in the administrative record supports Sedgwick's determination

12   to deny plaintiff's claim.  First, the administrative record confirms Sedgwick's consideration

13   of plaintiff's medical records, which documented his treating physician Dr. Mahmood's

14   determination that his condition allowed him to return to work with restrictions.  Those

15   restrictions did not preclude plaintiff from sedentary "desk work," and indeed, Dr. Mahmood

16   specifically stated, "Desk work/sitting OK."  Independent Physician Advisor Dr. Barbara

17   Parke reviewed plaintiff's medical records, and confirmed the extent and duration of

18   plaintiff's restrictions and limitations, in agreement with Dr. Mahmood.

19        Sedgwick also obtained a Transferable Skills Assessment, which considered

20   plaintiff's medical restrictions as well as his education and experience.  The Assessment

21   identified three occupations that plaintiff was reasonably capable of performing, and which

22   paid more than 50% of plaintiff's Basic Wage Rate at the time his LTD Plan benefits would

23   have started.  Those occupations comported with the medical restrictions that limited

24   plaintiff to sedentary desk work.

25        Plaintiff suggests that the Assessment is somehow invalid or inaccurate because he

26   has been unsuccessful in obtaining a new position through an internal job search.  But the

27   Plan's definition of "Total Disability" does not require Sedgwick to place plaintiff in a job with

28   Pacific Bell, or even to identify a specific employer for plaintiff.  See Pannebecker v. Liberty

United States District Court

For the Northern District of California

1   Life Assur. Co. of Boston, 542 F.3d 1213, 1219 & n.4 (9th Cir. 2008) (defendant did not

2   abuse its discretion in relying on transferable skills analysis to identify sedentary

3   occupations when it also did not consider issues outside plan requirements, such as

4   plaintiff's most recent salary or station in life).

5        Under the Plan's definition of "Total Disability" with regard to LTD, a claimant's

6   medical condition must be one that prevents him from "engaging in any employment for

7   which [he] is qualified or may reasonably become qualified based on education, training, or

8   experience."  Sedgwick identified three such occupations.  Sedgwick also provided plaintiff

9   with ample opportunity to obtain additional medical evidence to support his claim that his

10  restrictions preclude him from working at the occupations identified in the Assessment.

11       Nevertheless, in support of his appeal and his claim that he could not work, he

12  provided Sedgwick with the same 2006 records from Dr. Mahmood that had previously

13  been submitted in connection with the claim for STD benefits.  He provided no records from

14  any treating physician for the period after June 30, 2006, through his February 27, 2007

15  appeal.  Although plaintiff challenged some of the conclusions reached by the Transferable

16  Skills Assessment – specifically, the question whether his condition would preclude him

17  from typing – he did not challenge the accuracy of the underlying restrictions.  More

18  significantly, he offered no supplemental medical records or a contrary skills analysis

19  confirming his counsel's opinion of his restrictions and limitations, or his capacity to work.

20       Based on the information provided to Sedgwick, it was reasonable for Sedgwick to

21  conclude that none of the historical information supported plaintiff's claim for LTD benefits.

22  Specifically, nothing in Dr. Mahmood's February 2006 records – which released plaintiff to

23  return to work doing "desk work" and sitting for 8 hours a day, with some restrictions – or

24  any other medical records provided by plaintiff in support of his appeal documented a

25  condition so severe as to preclude plaintiff from performing any employment.

26       In addition, under the circumstances, it was reasonable for Sedgwick to rely on the

27  reports provided by the four Board-certified Independent Physician Advisors.  After

28  reviewing hundreds of pages of medical information and other related documents, each of

1  these medical specialists concluded (in agreement with plaintiff's treating neurologist) that

2  the medical evidence did not establish that plaintiff was not able to perform any occupation,

3  with accommodation.  To the contrary, they concluded that plaintiff was capable of

4  performing sedentary work, with certain restrictions.

5  **CONCLUSION**

6        The record before the court establishes that the Plan's determination was

7  reasonable, was made in good faith, and fully complied with ERISA's requirements.  In

8  accordance with the foregoing, the court GRANTS defendant's motion for summary

9  judgment and DENIES plaintiff's motion.

10

11  **IT IS SO ORDERED.**

12  Dated:  March 11, 2009

13  _____
    PHYLLIS J. HAMILTON
    United States District Judge

**United States District Court**
For the Northern District of California

23